JOHNIE F. WEEMS III ET AL. *v.* CITIGROUP, INC., ET AL.
(SC 17967)

Norcott, Palmer, Zarella, Sullivan and Martin, Js.

---

Argued September 18—officially released December 30, 2008

*Justin P. O'Brien,* pro hac vice, with whom were *Jeffrey S. Nobel* and, on the brief, *Michael A. Collora,* pro hac vice, and *David A. Bunis,* for the appellants (plaintiffs).

*Preeta D. Bansal,* pro hac vice, with whom were *Michael D. Blanchard, David S. Clancy,* pro hac vice, and *Kara E. Fay,* and, on the brief, *William P. Frank, Sarah E. McCallum* and *Thomas J. Dougherty,* for the appellees (defendants).

*Opinion*

NORCOTT, J. In this case, which comes to us upon our acceptance of a certified question of law from the United States District Court for the District of Massachusetts (District Court) pursuant to General Statutes

§ 51-199b (d),[1] we consider whether the forfeiture provisions of three different capital accumulation plans (plans) that the named defendant, Citigroup, Inc., and its defendant subsidiaries,[2] have offered to their employees both through voluntary payroll deductions (payroll plan) and for the payment of bonuses (bonus plan), violate Connecticut's wage statutes, General Statutes § 31-71a et seq. The plaintiffs in this class action, who are former employees of the defendants, argue that the forfeiture provisions of the plans violate the wage statutes because: (1) they enable the defendants to withhold accrued wages, including bonuses, from their employees; (2) the plaintiffs did not knowingly and voluntarily authorize the deductions; and (3) the state department of labor (department) never approved the deduction form. We answer the certified question in the negative.

The record certified by the District Court reveals the following undisputed facts and procedural history.[3] The plaintiff class representative, William Lomas,[4] was

[1] General Statutes § 51-199b (d) provides: "The Supreme Court may answer a question of law certified to it by a court of the United States or by the highest court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

[2] Citigroup, Inc., is the parent company of the defendants Travelers Group, Inc., Salomon Smith Barney Holdings, Inc., and Salomon Smith Barney, Inc. Hereinafter, we refer to these parties collectively as the defendants, and individually by name when appropriate.

[3] The parties have filed a statement of undisputed facts pursuant to General Statutes § 51-199b (f) (2) and Practice Book § 82-3.

[4] William Lomas was the named plaintiff and class representative for the Connecticut class action, which initially was filed in Connecticut Superior Court. The case subsequently was removed to the United States District Court for the District of Connecticut, and the judicial panel on multidistrict litigation transferred it to the United States District Court for the District of Massachusetts for coordinated pretrial proceedings in *Weems* v. *Citigroup, Inc.*, MDL-1354. Johnie F. Weems III, the named plaintiff in the present case, was the named plaintiff in the coordinated pretrial proceedings in the District Court for the District of Massachusetts.

employed in Connecticut as a broker for the defendant Salomon Smith Barney, Inc., formerly Smith Barney Shearson, from 1994 until 1998, when he resigned to join Merrill Lynch. Lomas, like other financial consultants employed by the defendants, participated in the various plans. The March 10, 1994 payroll plan election document that Lomas signed provides in relevant part: "I elect to participate in the Capital Accumulation Plan (CAP) subject to all of the provisions and administrative rules of the Plan. I hereby *irrevocably* direct my employer, Smith Barney Shearson, to pay me the percent indicated below in the form of restricted stock out of all cash compensation paid to me during the period indicated below. I understand if I leave Smith Barney Shearson voluntarily or am terminated with Cause before the restrictions lapse on shares of restricted stock received under the Plan, *I will forfeit the stock as well as the money I am hereby authorizing to be paid in the form of such restricted stock.* I further understand and agree that, in the sole discretion of the Committee, the shares to be awarded to me may be issued under another similar plan, on the same terms and conditions as described in the CAP enrollment package sent to me. . . ." (Emphasis altered.) The payroll plan permitted the participating employees to elect to receive 5, 10, 15 or 20 percent of their compensation in the form of restricted stock, and to make that election effective for six month periods, including January through June, 1994, and July through December, 1994.

Once the employees elected to participate in the payroll plan, the defendants would deduct the selected percentage from their gross pay and award them restricted stock shares twice each year, with the awards being evidenced by restricted stock award agreements. The number of shares awarded is determined by using the monetary value of the employee's contribution to purchase restricted shares of stock at a 25 percent

discount from their fair market value.[5] That discount reflects the risk of forfeiture and the restrictions on the sale or assignment of the stock, which last for two years from the date of the award. During that two year period, the payroll plan participant may not sell, transfer or assign the restricted shares, and, as stated on the election form, forfeits any unvested shares and the cash compensation used to purchase those shares if he or she terminates his or her employment voluntarily or is terminated for cause.[6] The participant does, however, receive dividend or dividend payment equivalents for those restricted shares, and may direct his or her votes even before they vest. Furthermore, under the Internal Revenue Code, 26 U.S.C. § 83, the participant may defer the payment of taxes on the award of the stock until after the expiration of the restriction period, because the shares are subject to a "substantial risk of forfeiture . . . ."

Other employees participated in the bonus plan that paid portions of discretionary bonuses to employees in the form of restricted stock. The percentages of the bonuses paid in restricted stock as opposed to cash varied over time, depending on the amount of the bonus and the employee's total compensation.[7] As with the

[5] The applicable fair market value was determined by averaging the month's end closing prices for the stock during the six month period immediately preceding the award date.

[6] If a participant is terminated for cause, or voluntarily terminates employment prior to an award of restricted stock for that six month period, however, the participant will receive a cash payment equivalent to what he or she would have received without participation in the program.

[7] For example, the 1998 bonus plans provided that participation in a plan was mandatory if the bonus amount or total annual compensation equaled or exceeded a certain amount, requiring, for example, that 10 percent of the first $200,000 in total annual compensation be awarded in the form of shares, 15 percent of the next $200,000 and 20 percent of the next $200,000. A subsequent 2001 bonus plan provided that any employee receiving a discretionary bonus of $20,000 or more would receive a cash award equal to 75 percent of the pretax value, and an award of restricted shares for 25 percent of the award package.

payroll plans, the bonus amounts were used to purchase the restricted shares at a 25 percent discount from the fair market value, and the restricted shareholders could vote their shares and receive dividends and equivalents, as well as defer taxes until after vesting; see 26 U.S.C. § 83; but would forfeit the shares and their cash value in the event of termination, either voluntary or for cause. Bonus plans in effect prior to 1994 had a two year restriction period, plans after 1994 had a three year restriction period, and current plans now have staggered vesting schedules that vest 25 percent of the stock on each one year anniversary for four years following the initial award. Smith Barney Shearson retail branch managers participated in similar bonus plans as well.

By way of example, Lomas elected to participate in the payroll plan and receive varying percentages of his compensation in the form of restricted stock during his employment, including 20 percent of his compensation during the two six month periods from January through June, 1994, and July through December, 1994. He received 10,981.46 shares of vested Citigroup, Inc., stock, with a market value of $183,536.42 upon vesting, as a result of his participation. When Lomas terminated his employment, however, he forfeited 3105.08 shares of restricted stock. Had he not participated in the plans, Lomas would have received $35,965.96 in cash compensation, rather than forfeiting those shares and the funds used to purchase them.

Lomas filed this class action complaint on behalf of himself and all other similarly situated former employees of the defendants in the Superior Court, alleging that the forfeiture provisions of the plans: (1) violated the wage statutes, specifically General Statutes §§ 31-

71b (a),[8] 31-71c[9] and 31-71e;[10] (2) constituted conversion; (3) required the imposition of a constructive trust; (4) breached the fiduciary duty owed to the plaintiffs; (5) violated the covenant of good faith and fair dealing; and (6) constituted unjust enrichment. The defendants removed the action to the United States District Court

[8] General Statutes § 31-71b (a) provides: "Each employer, by himself, his agent or representative, shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank which has agreed with the employer to accept such wage deposits."

[9] General Statutes § 31-71c provides: "(a) Whenever an employee voluntarily terminates his employment, the employer shall pay the employee's wages in full not later than the next regular pay day, as designated under section 31-71b, either through the regular payment channels or by mail.

"(b) Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge.

"(c) When work of any employee is suspended as a result of a labor dispute, or when an employee for any reason is laid off, the employer shall pay in full to such employee the wages earned by him not later than the next regular pay day, as designated under section 31-71b."

[10] General Statutes § 31-71e provides: "No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book."

We note that § 31-71e has been amended by Public Acts 2008, No. 08-118, § 1, which provides: "No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book, or (4) the deductions are for contributions attributable to automatic enrollment, as defined in section 2 of this act, in a retirement plan described in Section 401(k), 403(b), 408, 408A or 457 of the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended, established by the employer." Hereafter, unless otherwise indicated, all references to § 31-71e in this opinion are to the 2007 revision.

for the District of Connecticut pursuant to the federal court's diversity jurisdiction, and the judicial panel on multidistrict litigation transferred the case to the United States District Court for the District of Massachusetts for coordinated pretrial proceedings. Thereafter, the District Court, Keeton, J., certified a class of "all former employees of Citigroup [Inc.], Salomon Smith Barney [Inc.], Travelers Group, Inc., or related and affiliated companies in Connecticut who participated in the Capital Accumulation Plan of Citigroup, Inc., Travelers Group, Inc., Travelers, Inc., and/or Primerica Corporation who resigned or who were terminated on or after March 13, 1994 and as a consequence lost the right to receive shares of stock and/or options and/or other earned income under the terms of the plan upon termination."[11]

The defendants subsequently moved for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure on the first count of the complaint, which alleged violations of Connecticut's wage statutes. The District Court, Keeton, J., denied that motion, noting that the plaintiffs' claim presented a question of first impression under Connecticut law. Thereafter, the District Court, Gertner, J., certified the following question of law to this court: "Does the forfeiture provision of the Citigroup [Inc.] Capital Accumulation Plan violate . . . § 31-71a et seq.?"

The plaintiffs claim that the forfeiture provisions of the payroll, bonus and branch manager plans violate the wage statutes because: (1) the defendants did not pay their employees the wages due, but, rather, made payroll deductions that are unauthorized by the wage statutes; (2) the wage deductions were not knowingly and voluntarily authorized by the employees; and (3)

---

[11] The District Court certified similar classes in Florida and Massachusetts as well, but denied the plaintiffs' motion to certify a nationwide class.

the department did not approve the wage deduction form. We conclude that the bonuses, including those paid to branch managers, are discretionary merit bonuses not subject to Connecticut's wage statutes. With respect to the payroll plan, we conclude that the plaintiffs' consent to the deductions was knowing and voluntary, and that the defendants' failure to receive the department's approval of the form does not invalidate the deductions or provide a right of action for the employees.

I

Analysis of the certified question in this case requires us to begin with the threshold question of whether the various plan deductions are themselves " '[w]ages," as defined by General Statutes § 31-71a (3).[12] We begin with the bonus and branch manager plans. Citing numerous Superior Court decisions; see footnote 14 of this opinion; the plaintiffs claim that these bonus plans constitute wages subject to § 31-71a et seq. In response, the defendants argue that the bonuses were not wages because they were not linked to the ascertainable work performed by an individual, but rather, were discretionary and tied to the performance and profitability of the defendants' firms. We agree with the defendants, and conclude that the bonus and branch manager plans did not constitute wages under the wage statutes.

Whether a bonus constitutes a wage under § 31-71a (3) "raises a question of statutory construction, which is a [question] of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, includ-

[12] General Statutes § 31-71a (3) provides: " 'Wages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation . . . ."

ing the question of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Marsh & McLennan Cos.*, 286 Conn. 454, 464–65, 944 A.2d 315 (2008).

We begin with the text of § 31-71a (3), which defines " '[w]ages' " as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation . . . ." In our view, the statutory language is ambiguous because it is subject to two different reasonable readings: A bonus, even if discretionary or not specifically tied to identifiable extra work performed by an employee, could be considered "compensation for labor or services rendered" by that employee; General Statutes § 31-71a (3); it similarly is reasonable to read that language as linked expressly to identifiable extra work or services performed by a particular employee. Accordingly, § 1-2z permits us to consult extratextual sources in making this determination.

We first note that the legislative history from when § 31-71a (3) was enacted as No. 714, § 1, of the 1967 Public Acts, is silent about whether a bonus constitutes a wage. We find, however, the New York Court of Appeals' decision in *Truelove* v. *Northeast Capital & Advisory, Inc.,* 95 N.Y.2d 220, 738 N.E.2d 770, 715 N.Y.S.2d 366 (2000), to be highly persuasive. In that case, the plaintiff brought an action against his former employer to recover the unpaid balance of a profit sharing bonus. Id., 222. The distribution of the bonus was subject to the chief executive officer's sole discretion, with the payments contingent on the recipient's continued employment with the firm. Id., 222–23. After the plaintiff had resigned from the firm, the firm refused to make any further bonus payments, and the plaintiff brought an action claiming that the firm had violated New York's wage statutes by failing to pay him. Id., 223.

The court concluded that the plaintiff's bonus was not subject to the wage statutes because it was not a wage, as defined by N.Y. Labor Law § 190 (1) (McKinney 2002), which is similar to § 31-71a (3), in that it defines wages, in relevant part, as "the earnings of an employee *for labor or services rendered,* regardless of whether the amount of earnings is determined on a time, piece, commission or other basis. . . ." (Emphasis added.) The court emphasized that the "terms of the [firm's] bonus compensation plan did not predicate bonus payments upon [the employee's] own personal productivity nor give [the employee] a contractual right to bonus payments based upon his productivity. To the contrary, the declaration of a bonus pool was dependent solely upon his employer's overall financial success. In addition, [the employee's] share in the bonus pool was entirely discretionary and subject to the non-reviewable determination of his employer." Id., 224. Thus, the court concluded that "the wording of the statute, in expressly linking earnings to an employee's labor or services per-

sonally rendered, contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled. Discretionary additional remuneration, as a share in a reward to all employees for the success of the employer's entrepreneurship, falls outside the protection of the statute."[13] Id.; see *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 303–305, 783 A.2d 667 (2001) (profit sharing bonus not "wage," despite inclusion of "bonuses" under statutory definition of "wage," when award of bonus was dependent on employer discretion or factors other than employee's efforts); see also *Marsh v. Prudential Securities, Inc.*, 1 N.Y.3d 146, 154, 802 N.E.2d 610, 770 N.Y.S.2d 271 (2003) (distinguishing "golden handcuffs" forfeiture provisions in bonuses from those applicable to payroll deduction programs);[14]

---

[13] The court also "reject[ed] [the] plaintiff's argument that he had a vested right to the bonus payments once [the] defendant had declared that a bonus would be paid and calculated the amount of that bonus." *Truelove v. Northeast Capital & Advisory, Inc.*, supra, 95 N.Y.2d 225. The court emphasized that "an employee's entitlement to a bonus is governed by the terms of the employer's bonus plan," and noted that the bonus plan at issue in the case "explicitly predicated the continuation of bonus payments upon the recipient's continued employment status." (Internal quotation marks omitted.) Id.

[14] This conclusion is not inconsistent with the trial court cases cited by the plaintiffs. See, e.g., *Mangiofico v. McKelvey*, Superior Court, judicial district of New Britain, Docket No. CV-04-4000609-S (April 18, 2005) (denying motion to strike because bonus could constitute wages under § 31-71a [3] when plaintiffs alleged "connection between additional services performed, and the promised bonus," namely, continuing to work at corporation "for a significant period of time despite learning that the factory was going to close"); *Mislow v. Continuing Care of South Windsor, Inc.*, Superior Court, judicial district of New Haven, Docket No. CV-00-0443654-S (April 2, 2001) (denying motion to strike because bonus could constitute wage under § 31-71a [3] when plaintiff "alleged that the bonus was in exchange for his additional services"); *Wuerth v. Schott Electronics, Inc.*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-91-036406-S (March 12, 1992) (denying motion to strike because plaintiff "has alleged a connection between the additional work performed and the promise of a bonus; he has alleged that the bonus was in exchange for his additional services"); but see *Butler v. Cadbury Beverages, Inc.*, United States District Court, Docket No. 3:97-CV-2241, 1999 U.S. Dist. LEXIS 16098, *7–8 (D. Conn. June 30, 1999)

cf. *Murphy* v. *First Union Capital Markets Corp.*, 152 N.C. App. 205, 208–209, 567 S.E.2d 189 (2002) (bonus paid in form of restricted stock was wage, despite fact that it had not vested, because state statute specifically defined "wages" as including "bonuses"). We agree with the analysis in *Truelove,* and we conclude, therefore, that bonuses that are awarded solely on a discretionary basis, and are not linked solely to the ascertainable efforts of the particular employee, are not wages under § 31-71a (3).

Accordingly, we further conclude that the terms of the regular and branch manager bonuses in this case are not wages subject to Connecticut's wage statutes. Payments under both the bonus and branch manager programs are purely discretionary. Although the plaintiffs argue that the branch managers had to achieve "specific goals" to receive the bonuses, thus rendering them compensation for services rendered, a review of the bonus plans cited in the parties' joint appendix, as well as the deposition of Robin Leopold, human resources director for Salomon Smith Barney, Inc., indicate that the bonus awards are tied to subjective factors such as diversity within a branch, and the profitability of the particular branches, which are factors not entirely predictable or within the control of the specific employee. Thus, we conclude that the bonus and branch manager programs are not wages contemplated by § 31-71a (3), and, therefore, the wage statutes are inapplicable to these particular claims.

II

We next turn to the payroll plan. The plaintiffs claim that their pay stubs prove that the payroll plan was funded by deductions from the amount paid as "cash

(denying motion for summary judgment because bonus to in-house attorney may be wage under § 31-71a [3], although case presented potential wrongful termination issues based on racial discrimination).

compensation" for the relevant pay period, compensation for which ordinarily would be due in full under § 31-71c upon the termination of their employment, absent valid deductions under § 31-71e (2). See footnote 10 of this opinion. Accordingly, the plaintiffs contend that the forfeiture provision of the payroll plan violates § 31-71e (2) because they did not knowingly and voluntarily authorize those deductions, and the department never approved the election form.[15]

We begin by assuming, without deciding, that the contributions to the plans were deductions from wages under § 31-71a (3), as explained by *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 159–60, 793 A.2d 1068 (2002).[16] Specifically, we assume that, under the plain-

[15] The plaintiffs also raise, as a corollary argument, a claim that the forfeiture provisions violate Connecticut's strong public policy against the forfeiture of earned compensation and benefits, which would benefit the employer at the employee's expense. We decline to address this claim because it is outside the scope of the certified question, which is limited to whether the various plans violate the wage statutes, which in any event constitute the legislature's expression of our state's public policy in this field. See *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 715, 802 A.2d 731 (2002) ("just as the primary responsibility for formulating public policy resides in the legislature . . . so, too, does the responsibility for determining, within constitutional limits, the methods to be employed in achieving those policy goals" [citations omitted]).

[16] In *Mytych*, we rejected the claim brought by shoe salespersons that the defendant department stores' practice of calculating commissions by deducting the employee's pro rata share of the unidentified merchandise returns from the gross amount violated Connecticut's wage statutes. *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 163–64. We stated that " '[w]ages' " under § 31-71a (3) is a "[broad]" definition that "lists certain nonexclusive factors that may assist in the computation of an employee's wage, [and] it fails to set forth a specific formula by which wages must be calculated or determined. Rather, it merely requires that wages be paid as compensation to an employee for services rendered. The determination of the proper amount to be tendered purposely is left vague by the reference to 'or other basis of calculation' contained in § 31-71a (3)." Id., 159. We further concluded that "[t]he language used in § 31-73 (b) also suggests that the legislature intended that the employer-employee agreement, as opposed to a statutory formula, control the manner in which wages are calculated. Section 31-73 (b) provides in relevant part: No employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages . . . or deduct any

tiffs' employment agreement with the defendants, the wages due to them would be the gross compensation amount that had accrued during the relevant pay period, with the contribution to the plans being, therefore, a deduction from that gross amount.[17] See *Marsh* v. *Prudential Securities, Inc.*, supra, 1 N.Y.3d 154 (rejecting argument that investment contributions are not deductions from wages because "it is clear that plaintiff authorized periodic withholdings from his compensation to finance the eventual purchase of fund shares").

part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages . . . or deduction is necessary to secure employment or continue in employment. . . . Although the statute does not define the term 'agreement,' it provides that the agreement shall not be violated by any deductions or other conditions. Similarly, § 31-71e provides that [n]o employer may withhold or divert any portion of an employee's wages . . . . The statute does not purport to define the wages due; it merely requires that those wages agreed to will not be withheld for any reason." (Internal quotation marks omitted.) Id., 159–60; see also id., 160 ("[T]here are no formulaic strictures provided. Instead, the formula by which an employee's wage is calculated is determined by the agreement between the employer and the employee."). Accordingly, we concluded that the pro rata deduction for returns was not an illegal deduction from wages, because the employees had agreed to that method of calculating their commissions. Id., 166.

[17] Supporting this assumption is the undisputed fact that the plaintiffs could have opted not to participate in the payroll plans, thereby entitling them to full cash compensation instead of a hybrid of cash and restricted stocks. We note, however, that the defendants argue that the restricted stock did not constitute a wage under § 31-71a (3) since it had not vested under the agreed upon terms of the payroll plan, and if it was considered a wage that had currently accrued, it would not have been subject to a "substantial risk of forfeiture" for federal tax purposes. Our independent research has revealed some recent authority supporting the defendants' argument, and concluding that stock options are not wages subject to Idaho's wage statutes, which define wages identically to § 31-71a (3). See *Paolini* v. *Albertson's, Inc.*, 143 Idaho 547, 549–50, 149 P.3d 822 (2006) (relying on methods of payment directed in related statutes in concluding that "[n]onmonetary compensation such as stock options cannot be wages because that form of compensation is not payable in cash, with a check, or by deposit into the employee's account"). Nevertheless, for the purpose of this analysis, we decline to address the defendants' argument on this point, and assume that the gross compensation amount constituted the wage, with the payroll plan contributions being deductions therefrom.

Accordingly, we address in turn the plaintiffs' contentions that the deductions violated the wage statutes, and specifically § 31-71e (2), because: (1) they were not knowingly and voluntarily authorized; and (2) the department never approved the election form prior to its use by the defendants.

A

We begin with the plaintiffs' claim that the forfeiture provision in the plan violated § 31-71e (2) because the deductions were not knowing and voluntary. Specifically, the plaintiffs contend that, because authorized deductions from wages amount to a waiver of the employee's right under the wage statutes to receive payment of earned wages in full and on time, established case law on the topic of waiver requires that the deductions be voluntary and with the understanding of the consequences thereof. They then claim that the information provided about the forfeiture provision in the plans fails to render the deductions knowing and voluntary. In response, the defendants argue that other courts have rejected challenges under their states' wage statutes to the forfeiture provisions of the same and other similar plans. The defendants also emphasize that the plan participants clearly gave informed written authorization for any deductions, and understood the benefits and risks attendant to the plans. We agree with the defendants.

Prior to its amendment by No. 08-118, § 1, of the 2008 Public Acts, which does not affect the claims in this case; see footnote 10 of this opinion; § 31-71e provided: "No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) *the employer has written authorization from the employee for deductions on a form approved by the commissioner*, or (3) the deductions are authorized by

the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book." (Emphasis added.) The plaintiffs contend, and the defendants do not extensively dispute for the purpose of this argument,[18] that a wage deduction that is not knowing, informed and voluntary does not satisfy the written authorization requirement of § 31-71e (2). Indeed, other states' case law, including that addressing these or similar plans, appears to import such a requirement into their wage statutes. See *Caviness* v. *Andes & Roberts Bros. Construction Co.*, 508 S.W.2d 253, 255 (Mo. App. 1974) (Discharged employee failed to state a claim under the wage statute for the recovery of sums in his employer's payroll savings fund because the "[p]laintiff by his voluntary choice elected to have [$20] of his wages deducted each week for deposit into the payroll saving fund. When that money was deducted weekly and invested, it was separated and changed in character from wages just as effectively as if the deduction were for the purchase of United States [g]overnment [s]avings [b]onds."); *Coast Hotels & Casinos, Inc.* v. *State Labor Commission*, 117 Nev. 835, 842–43, 34 P.3d 546 (2001) (wage statute "contemplates a written authorization that is voluntary" and requires employee to execute "knowing and intelligent waiver of . . . right to receive full pay" with respect to deductions to compensate casino for shortages in employee's cash drawer); *Rosen* v. *Smith Barney, Inc.*, 393 N.J. Super. 578, 586, 925 A.2d 32 (App. Div. 2007) (no statutory violation when "[w]ithout question, the [capital

---

[18] The defendants posit that whether the authorization is sufficiently informed might support a claim for breach of contract, but is not relevant to whether the statutory prerequisite has been satisfied. They do not, however, offer any further analysis with respect to the substantive content of the written authorization requirement under § 31-71e (2), proceeding instead to argue that the authorizations given by the plaintiffs herein were sufficiently informed.

accumulation plan] terms were fully disclosed and plaintiffs' participation was pursuant to a written agreement"), aff'd, 195 N.J. 423, 425, 950 A.2d 205 (2008) (no statutory violation when "the plan in which these plaintiffs participated, was entirely voluntary and its terms were fully disclosed to each of them"); *Marsh* v. *Prudential Securities, Inc.*, supra, 1 N.Y.3d 156 (rejecting wage statute claims and concluding that "the disclosed risks do not negate the multiple benefits that these knowledgeable employees receive from their voluntary participation in the program"); see also *Kim* v. *Citigroup, Inc.*, 368 Ill. App. 3d 298, 306, 856 N.E.2d 639 (2006) (noting that text of Illinois wage statute, 820 Ill. Comp. Stat. 115/9 [West 2002], requires " 'express written consent of the employee, given freely at the time the deduction is made' "), appeal denied, 222 Ill. 2d 609, 862 N.E.2d 235 (2007).

We conclude that the written authorization herein was informed and voluntary. The payroll plan election document recited in the statement of undisputed facts, signed by the class representative, is a model of clarity, providing in relevant part: "I elect to participate in the Capital Accumulation Plan (CAP) subject to all of the provisions and administrative rules of the Plan. I hereby *irrevocably* direct my employer, Smith Barney Shearson, to pay me the percent indicated below in the form of restricted stock out of all cash compensation paid to me during the period indicated below. *I understand if I leave Smith Barney Shearson voluntarily or am terminated with Cause before the restrictions lapse on shares of restricted stock received under the Plan, I will forfeit the stock as well as the money I am hereby authorizing to be paid in the form of such restricted stock. . . .*" (Emphasis altered.) Indeed, after reading this statement, Lomas elected to receive 20 percent of his compensation in the form of restricted stock, and renewed that election in varying percentages until he

left the defendants' employ in 1998.[19] Accordingly, we conclude that the payroll plans complied adequately with the written authorization requirement of § 31-71e (2).[20]

B

We next address the plaintiffs' claim that they are entitled to damages under the wage statutes because the deductions were not "on a form approved by the commissioner" of the department, as is required by § 31-71e (2). The plaintiffs rely on *Engle* v. *Personnel Appeal Board*, 175 Conn. 127, 394 A.2d 731 (1978), and contend that this portion of the statute is a mandatory provision, which "invalidates any wage deductions that resulted from the use of an unapproved form." In

---

[19] The plaintiffs, citing the deposition testimony of Leopold, emphasize that much of the consent was "negative consent," as many of the employees participating in the plans signed the enrollment form only once. Leopold stated that negative consent was utilized for several years, and that Salomon Smith Barney, Inc., automatically reenrolled employees in the plans when they had participated in previous years. As the defendants point out, however, they sent periodic negative consent notices to their employees advising them of the opportunity to change their election percentage. Indeed, Lomas availed himself several times of that opportunity, and changed his stock allocation from 20 to 10 to 5 to 10 percent during the course of his participation in the payroll plan.

[20] Indeed, our conclusion that these forms provided adequate disclosure prior to the employees' election to participate in the plan is consistent with sister state decisions that have rejected challenges, albeit under somewhat differently worded statutes, either to these particular plans, or to similar restricted stock programs. See *Kim* v. *Citigroup, Inc.*, supra, 368 Ill. App. 3d 306–307; *Rosen* v. *Smith Barney, Inc.*, supra, 195 N.J. 425; *Marsh* v. *Prudential Securities, Inc.*, supra, 1 N.Y.3d 156. We also note that the California Court of Appeals recently has rejected similar claims, although that decision is pending further review by the Supreme Court of California. See *Schachter* v. *Citigroup, Inc.*, 159 Cal. App. 4th 10, 19–21, 70 Cal. Rptr. 3d 776, depublished upon grant of review, 183 P.3d 383, 76 Cal. Rptr. 3d 681 (2008). Finally, the United States Court of Appeals for the First Circuit recently has rejected challenges to the plans under the common law of Florida and Georgia, holding specifically that the plan documents unambiguously inform plan participants of the risk of forfeiture. See *In re Citigroup, Inc.*, 535 F.3d 45, 55–56 (1st Cir. 2008).

response, the defendants contend that their failure to seek the department's approval of the form does not invalidate the deductions because the violation did not fall within the scope of General Statutes § 31-72,[21] which affords employees a private right of action for the failure to pay wages. The defendants also argue that the statute is directory, rather than mandatory, because it is drafted in affirmative, rather than negative terms, and does not explicitly provide a penalty or a right of action for noncompliance, or provide guidance for the department's decision to approve or deny a particular form. We agree with the defendants, and conclude that this portion of § 31-71e (2) is directory.

We begin by noting that the narrow question presented by this aspect of this case is whether the failure to obtain the department's approval of a wage deduction form invalidates and requires a refund of the deductions, even when, as we concluded in part II A of this

---

[21] General Statutes § 31-72 provides: *"When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i,* inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, *such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action.* The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person." (Emphasis added.)

opinion, the written authorization itself is legally sufficient. The language of § 31-71e provides in relevant part: "No employer may withhold or divert any portion of an employee's wages unless . . . (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner . . . ." The key, then, is whether the requirement that the commissioner approve of the form is mandatory or directory, which raises a question of statutory interpretation. See General Statutes § 1-2z.

"The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. . . . If, however, the . . . provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory . . . ." (Citation omitted; internal quotation marks omitted.) *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 746, 865 A.2d 428 (2005). Linguistically, a statutory provision generally is considered directory if "the requirement is stated in affirmative terms unaccompanied by negative words."[22] (Internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 19, 848 A.2d 418 (2004); see also *Santiago* v.

---

[22] Other indications that a statute is directory rather than mandatory include the use of the word "may," which "ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion. . . . Therefore, when the legislature opts to use the words shall and may in the same statute, they must then be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings." (Citation omitted; internal quotation marks omitted.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 20, 848 A.2d 418 (2004); id. ("[i]t is especially relevant that the legislature chose to use the word 'shall' when referring to service of an apportionment complaint in contrast to the more permissive, 'may,' which is used with respect to the right to bring an apportionment claim").

*State*, 261 Conn. 533, 534 n.1, 540, 804 A.2d 801 (2002) (relying on negative language, specifically, " '[n]o appeal may be taken from a judgment denying a petition for a new trial' " without judicial certification, as well as statute's policy objective of avoiding frivolous appeals, in concluding that General Statutes § 54-95 [a] appeal certification requirement is mandatory). Furthermore, the lack of a penalty provision or invalidation of an action as a consequence for failure to comply with the statutory directive is a significant indication that the statute is directory. See, e.g., *Teresa T.* v. *Ragaglia*, supra, 746–47 ("[t]he absence of a penalty if the commissioner fails to invoke the ninety-six hour hold after making a finding of probable cause further suggests that [General Statutes] § 17a-101g [c] does not impose a mandatory duty"); *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 466, 692 A.2d 742 (1997) (statute directory because "although [it] uses the word, 'shall,' there is no language expressly invalidating a defective notice"); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 446–47, 685 A.2d 670 (1996) ("Neither [General Statutes] § 4-180 [c] nor [General Statutes] § 4-183 [c] contains language that would invalidate an action that failed to comply strictly with the mailing provisions of § 4-180 [c]. This omission indicates a legislative intent that the provisions operate to secure order, system and dispatch in the proceedings.").

The statute at issue in this case is drafted at least partially in negative language, which supports the plaintiffs' argument.[23] See General Statutes § 31-71e ("[n]o

[23] There is no legislative history on point except for the remarks of Leon Lemaire, who represented the Manufacturers' Association of Connecticut in opposing the bill that was enacted as, in part, § 31-71c. See Conn. Joint Standing Committee Hearings, Labor, 1967 Sess., p. 126. Lemaire stated that some companies already were requiring written authorization for deductions, while many did it on the basis of oral requests for deductions for health insurance, for example. Id., p. 127. Citing the breadth of the provision, and the approval requirement, Lemaire stated that "everyone will end up having to sign one of these forms." Id. The record does not reveal, however,

*employer may withhold* or divert any portion of an employee's wages unless . . . [2] the employer has written authorization from the employee for deductions on a form approved by the commissioner" [emphasis added]). The statute does not, however, expressly invalidate deductions made on unapproved forms, and the only penalty provision that arguably is implicated by the failure to seek department approval is General Statutes § 31-71g,[24] which does not invalidate the transaction, but provides merely for fines, a term of imprisonment or both.[25] Even the applicability of § 31-71g is doubtful, however, because even the most minor penalties available under that statute contemplate the presence of "unpaid wages," a predicate not present herein, inasmuch as the plaintiffs gave knowing and voluntary consent to specific deductions from the gross wages owed to them. See General Statutes § 31-71g ("[a]ny employer

---

any responses to Lemaire's concerns by legislators that might shed light on the consequences of violating § 31-71e.

[24] General Statutes § 31-71g provides: "Any employer or any officer or agent of an employer or any other person authorized by an employer to pay wages who violates any provision of this part may be: (1) Fined not less than two thousand nor more than five thousand dollars or imprisoned not more than five years or both for each offense if the total amount of all unpaid wages owed to an employee is more than two thousand dollars; (2) fined not less than one thousand nor more than two thousand dollars or imprisoned not more than one year or both for each offense if the total amount of all unpaid wages owed to an employee is more than one thousand dollars but not more than two thousand dollars; (3) fined not less than five hundred nor more than one thousand dollars or imprisoned not more than six months or both for each offense if the total amount of all unpaid wages owed to an employee is more than five hundred but not more than one thousand dollars; or (4) fined not less than two hundred nor more than five hundred dollars or imprisoned not more than three months or both for each offense if the total amount of all unpaid wages owed to an employee is five hundred dollars or less."

[25] Indeed, unpaid wages similarly are a factual predicate for recovery under § 31-72, which permits an employee to bring a civil action to recover unpaid wages, including double damages and attorney's fees if the failure to pay wages arises from the employer's " 'bad faith, arbitrariness or unreasonableness.' " *Sansone* v. *Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991); see also footnote 21 of this opinion.

or any officer or agent of an employer or any other person authorized by an employer to pay wages who violates any provision of this part may be . . . [4] fined not less than two hundred nor more than five hundred dollars or imprisoned not more than three months or both for each offense if *the total amount of all unpaid wages owed to an employee is five hundred dollars or less*" [emphasis added]). Indeed, those employees who intelligently elected to participate in the plans and adhered to their terms by maintaining their employment until the restricted shares vested received the benefits of discounted shares, as well as a tax deferral. Thus, a review of the statutory language, which lacks a provision holding deductions on unauthorized forms invalid per se, indicates that the department approval requirement is directory.[26]

---

[26] We disagree with the plaintiffs' reliance on *Engle* v. *Personnel Appeal Board*, supra, 175 Conn. 129–30, in which this court concluded that, under General Statutes § 5-209, the approval of the state personnel commissioner was mandatory before a state employee could be compensated at a higher rate for performing tasks attendant to a higher job classification for more than sixty days. The statutory language in question provided: " 'Any state employee who is assigned, by his appointing authority, duties and responsibilities of a job classification higher than the class in which he is placed, on a continuous basis for a period of more than sixty working days, shall be compensated for such time in excess of sixty days at a rate in the higher class which shall not be less than one step in that class above his existing rate of pay, *provided such payment shall be approved by the personnel commissioner*. Service in a higher classification under this section shall not constitute permanent status in such class.' " (Emphasis in original.) Id., 129, quoting General Statutes § 5-209. This court rejected a state employee's claim that the commissioner's approval was not necessary for her to be paid at a higher level, stating that "[a]dopting the plaintiff's position would effectively eliminate the proviso from the statute. The statute expressly makes payments contingent on approval by the personnel commissioner; if the commissioner is powerless to withhold approval once the work has been performed, then the proviso is meaningless." *Engle* v. *Personnel Appeal Board*, supra, 129. The court further noted that the proviso was important to the essence of the civil service statutes, which were intended to give the "personnel commissioner . . . broad powers to administer the state personnel system and was to supervise carefully any changes in employee placement," as well as to limit provisional and emergency appointments. Id., 133. Requiring the approval of the personnel commission avoided the possibility

Moreover, as the defendants point out, an interpretation of § 31-71e requiring the automatic invalidation and refund of *any* wage deductions made on unapproved forms conceivably could result in unwarranted windfalls for employees, such as in the hypothetical posited by the defendants of an employer deducting money from an employee's paycheck to pay for homeowner's insurance offered as a voluntary employee benefit. Invalidating and requiring a refund of those deductions based on the employer's failure to seek the department's approval of the form would give the employee the windfall of free insurance. Although it is well established that the wage collection statutes are "remedial in nature," namely, intended "to prevent the employer from taking advantage of the legal agreement that exists between the employer and the employee"; *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 160–61; and should be construed liberally in the employees' favor; see, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 240, 828 A.2d 64 (2003); that construction does not require windfalls for technical violations. Accordingly, we conclude that the defendants' failure to seek the department's approval of the plan election form does not, by itself, require the invalidation of the authorized payroll plan deductions.

The certified question is answered in the negative.

No costs will be taxed in this court to either party.

In this opinion the other justices concurred.

---

of all appointing authorities from using "§ 5-209 to circumvent other requirements of the State Personnel Act, and perhaps even subvert the goals of the merit system." Id., 133–34.

In our view, *Engle* is distinguishable from the present case. First, § 31-71e (2) lacks the explicit proviso language of § 5-209. Second, the essence of the wage statutes is to protect employees from being taken advantage of by their employers. See, e.g., *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 160–61. If the employee has knowingly and voluntarily consented to the deduction at issue, and even benefited from it, then invalidating deductions because of a technical violation does not further the purpose of the wage collection statutes.