NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 124

No. 2017-193

| | |
|---|---|
| David Tanzer | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Civil Division |
| | |
| MyWebGrocer, Inc., Richard E. Tarrant, Jr. and Jeremiah F. Tarrant | March Term, 2018 |

Helen M. Toor, J. (summary judgment); Robert A. Mello, J. (final judgment)

Karen McAndrew and Kendall Hoechst of Dinse, Knapp & McAndrew, P.C., Burlington, for
  Plaintiff-Appellee/Cross-Appellant.

Bridget C. Asay of Stris & Maher LLP, Montpelier, and Jerome F. O'Neill of Gravel & Shea, PC,
  Burlington, for Defendant-Appellant/Cross-Appellee MyWebGrocer, Inc.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **CARROLL, J.** This case arises from a dispute between an employer, MyWebGrocer, and an employee, David Tanzer, regarding the payment of phantom shares MyWebGrocer promised in an agreement between the parties. MyWebGrocer appeals the trial court's decision on summary judgment finding that MyWebGrocer breached this agreement, a jury verdict finding that the company breached the covenant of good faith and fair dealing, the jury's damages awards, and a post-verdict order awarding Tanzer attorney's fees in connection with the litigation between the parties. Tanzer appeals the trial court's post-verdict decision on attorney's fees as well, arguing that the court erroneously limited the amount of fees that he could collect.

Tanzer also appeals the trial court's decision on summary judgment that the amount he was due under the phantom share plan did not fall within the definition of wages for purposes of Vermont's wage statutes. We reverse the trial court's decision regarding whether MyWebGrocer breached the parties' agreement and vacate the jury's verdict and damages awards in connection with Tanzer's claim that MyWebGrocer breached the covenant of good faith and fair dealing. We also reverse the trial court's decision at summary judgment on Tanzer's statutory claim and conclude that the value of the phantom shares falls within the relevant statutory definition of wages. We need not address the court's post-verdict decision regarding whether Tanzer could collect attorney's fees.

## I. Factual and Procedural Background

### A. The Parties and the Phantom Share Plan

¶ 2.     MyWebGrocer is a company that provides web-based e-commerce systems for grocery stores nationwide. Richard Tarrant and Jeremiah Tarrant are officers of the company. MyWebGrocer hired David Tanzer in 2000 and he served as the company's principal database architect until his employment was terminated in 2008. MyWebGrocer was organized as an LLC during the entirety of Tanzer's employment. As part of Tanzer's compensation package, he was given membership in the company's phantom share plan. Tanzer's phantom share agreement provided that his phantom shares would vest at a rate of 1/36 per month after successful completion of an initial post-employment probation period. He also received lump sum phantom share awards that vested over a specified period of years, and, for a period of his employment, also received vested phantom shares per pay period in lieu of a portion of his salary.

¶ 3.     A phantom share plan gives employees a financial stake in the employing enterprise. In the context of a corporation, "[p]hantom stock is the grant of a right to the appreciation in the corporation's stock, with a fixed exercise date and method of calculation." 5A Fletcher Cyclopedia of the Law of Corporations § 2137.20 (2018). The same principle applies to a phantom share plan, with the distinction that the value of an interest in a phantom share plan is tied to a distributional

2

interest in an LLC, rather than the value of stocks.  In contrast to an options plan, neither phantom stock in a corporation, nor a phantom share in the distributional interest of an LLC, dilutes ownership of the business entity as a whole.  Id.; 18B Am. Jur. 2d Corporations § 1692 (2018) ("A phantom stock plan is a bonus plan intended to give the management of a closely held corporation a financial interest in a company without giving them an equity interest in the corporation.").

¶ 4.	Several versions of MyWebGrocer's phantom share plan were introduced in the trial court and are part of the record on appeal, including plans from 2000, 2001, 2005, 2008, and 2009. When Tanzer's employment with MyWebGrocer was terminated in 2008, he was told that he had 103,576 vested shares in the plan.  Tanzer was also given a summary of the phantom share plan from the year 2000 and a summary version of the plan dated February 21, 2008.  While some of the plan language varied across iterations, each version of the plan included a provision stating that a change in the control of the company would trigger conversion of vested phantom shares into a distributional interest in the company.  Each plan provided a formula by which such a distributional interest would be calculated; each plan after 2000 included a separate provision stating that the plan's administering committee had the authority to issue phantom shares but that the total phantom shares issued could not exceed ten percent of the company's overall distributional interest.  Each version of the plan also included a provision stating that the plan would be amended if MyWebGrocer converted from an LLC to a corporation other than through holding an initial public offering (IPO), and provided a means for converting the distributional interest associated with vested phantom shares to shares of stock in the event of an IPO.

¶ 5.	In 2009, in anticipation of a $13,000,000 investment, MyWebGrocer converted from an LLC to an entity incorporated under the laws of Delaware.  At the time of the conversion, MyWebGrocer amended the phantom stock plan, changing the formula included in prior plans for calculating the value of the distributional interest of the phantom shares to a formula calculating the value of the phantom shares in terms of common stock ownership.  The 2009 plan also capped the

3

number of phantom shares at the number of vested shares at the time of corporate reorganization—a total of 2,544,160 vested phantom shares. When converted using the 2009 plan's formula, the phantom shares were equivalent to 254,416 shares of common stock.[1] The former owners of MyWebGrocer, now shareholders in the newly formed corporation, held the remaining shares in the company, a total of 2,250,001 shares of common stock. Just after the corporate conversion, MyWebGrocer issued 785,462 shares of preferred stock to the investor, thereby diluting the percentage of the company owned by common stockholders and members of the phantom share plan, although not diminishing the value of their respective stocks and shares.

¶ 6.    MyWebGrocer entered a merger agreement in 2013, which triggered a cashout of the phantom shares. The value of the phantom shares was calculated using the 2009 plan's formula for valuation. MyWebGrocer offered Tanzer $538,667.45 for the phantom shares he had accrued during his employment. He was also offered $50,885.81 from a $16,500,000 escrow account that the parties to the merger had created by agreement and that would be paid out if certain conditions were met. Tanzer disputed MyWebGrocer's valuation of the phantom shares, arguing that the plan provided that phantom shareholders collectively would receive ten percent of the total merger consideration upon payout and that MyWebGrocer's valuation gave phantom shareholders between seven and eight percent of the merger consideration. After back and forth between the parties and the parties' attorneys, MyWebGrocer offered to settle the dispute with Tanzer. Tanzer did not accept the terms of the proposed settlement and instead filed a complaint in the superior court's civil division.

### B. The Trial Court Proceedings

¶ 7.    Tanzer's initial complaint included four counts, each essentially premised on Tanzer's argument that MyWebGrocer had undervalued his phantom shares. To that end, Tanzer's

---

[1] The reduction from 2,544,160 vested phantom shares to 254,416 shares of common stock was the result of a ten-percent reverse share/stock split which applied to the distributional interests in the company as well.

complaint alleged that (1) MyWebGrocer breached its contractual obligations to Tanzer by failing to pay him the total due under the phantom share plan, (2) the company breached the covenant of good faith and fair dealing by "engaging in conduct intended to deny him the benefit of his bargain with" MyWebGrocer, (3) the company was unjustly enriched by its failure to pay Tanzer the total due for his phantom shares, and (4) MyWebGrocer violated Vermont's wage law by witholding Tanzer's "deferred compensation" in the form of the total value of his phantom shares and by requiring Tanzer to sign a release as a condition of receipt of the value of his phantom shares. In connection with these claims, Tanzer sought compensatory damages, statutory double damages for the alleged violation of Vermont's wage law, attorney's fees, punitive damages, costs and interest, and injunctive relief precluding MyWebGrocer from releasing escrowed funds pending resolution of the dispute with Tanzer.

¶ 8.　MyWebGrocer's answer set forth several affirmative defenses and raised six counterclaims against Tanzer, including breach of contract, breach of the duty of loyalty, unfair competition, two allegations of unjust enrichment, and breach of the duty of good faith and fair dealing. Tanzer later amended his initial complaint to add a count based on promissory estoppel. He amended his complaint again to clarify the relief sought for his claims, seeking compensatory damages including attorney's fees, double statutory damages and attorney's fees for the alleged Vermont wage law violation, punitive damages, and costs and interest.

¶ 9.　The parties filed cross motions for summary judgment. Tanzer sought summary judgment for breach of contract and for his claim that MyWebGrocer violated Vermont's wage and compensation law by withholding the total amount due to him for his phantom shares. MyWebGrocer sought summary judgment on all of its claims against Tanzer.

¶ 10.　The court ruled in Tanzer's favor on his claim for breach of contract and on each of MyWebGrocer's counterclaims against him. The court ruled in MyWebGrocer's favor on Tanzer's statutory claim. Regarding Tanzer's contract claim, the court concluded that the 2008 phantom share

5

plan given to Tanzer at the time of his termination was the controlling agreement between the parties regarding valuation of Tanzer's phantom shares. The court read the 2008 plan to set the total number of phantom shares awarded at ten percent of the company's value at the time of payout of the shares, regardless of the intervening corporate reorganization and the plan's provision permitting amendment of the plan upon reorganization. The court further concluded that post-incorporation issuance of new stock had diluted the ownership interests of all shareholders, including the phantom shareholders, such that the phantom shareholders' stake in the company was less than ten percent when the value of the phantom shares were paid out. Accordingly, the court concluded that MyWebGrocer had undervalued Tanzer's phantom shares and breached the phantom shares agreement between the parties.

¶ 11. Concluding that Tanzer's alternate claims against MyWebGrocer for unjust enrichment and promissory estoppel were premised on the same underlying facts as his contract claim, the court ruled that these two claims were moot. Regarding Tanzer's statutory claim for wages, the court concluded that the phantom shares "were more like a lottery ticket than a debt." The court understood the phantom shares to be essentially valueless unless a triggering event occurred, and thus not within the scope of Vermont's wage and compensation law. The court accordingly granted summary judgment for MyWebGrocer on this claim.

¶ 12. The court read MyWebGrocer's counterclaims against Tanzer as premised on the argument that Tanzer improperly used his special expertise to gain concessions from MyWebGrocer during his employment with the company. Concluding that as a matter of law such an argument could not support an action for breach of contract, breach of the duty of loyalty, unfair competition, unjust enrichment, or breach of the duty of good faith and fair dealing, the court granted summary judgment on each of these claims in Tanzer's favor. The court's decision on summary judgment left a single claim alive—Tanzer's claim against MyWebGrocer for breach of the covenant of good faith and fair dealing, the basis of which concerned not only MyWebGrocer's failure to pay him the

6

amount he claimed was due, but also MyWebGrocer's conduct in connection with the payout and the dispute which followed.

¶ 13. Following discovery and several motions between the parties, a five-day jury trial on the covenant of good faith and fair dealing claim commenced on March 20, 2017. Before the trial began, MyWebGrocer filed a motion to exclude the use of or any reference to the court's summary judgment decision in Tanzer's favor on his breach of contract claim. Tanzer argued in response that he intended to rely on the substance of that decision to support his claim for breach of the covenant of good faith and fair dealing. The court concluded that it would "likely be necessary to reference previous court rulings to give the jury necessary background information and assist in the orderly presentation of evidence" but that prior rulings could not be used to influence the jury one way or another. The court ruled that it would instruct the jury at the start of trial that a breach of contract claim had already been decided in Tanzer's favor and stated that it would consider a limiting instruction regarding prior rulings.

¶ 14. The jury found in Tanzer's favor on his covenant of good faith and fair dealing claim. Tanzer was awarded $100 for emotional distress, $300,000 in compensatory damages other than emotional distress, and $750,000 in punitive damages. These awards were in addition to the amount awarded on Tanzer's breach of contract claim as a result of the court's decision on summary judgment.

¶ 15. After the trial concluded, Tanzer filed a motion requesting attorney's fees in addition to the awards he received in connection with the contract and covenant of good faith and fair dealing claims. The court ordered that Tanzer could collect attorney's fees in connection with some of MyWebGrocer's conduct during the course of the litigation, which the court found was dishonest and done in bad faith. Tanzer was not permitted, however, to collect attorney's fees in connection with MyWebGrocer's litigation positions, including fees expended in defense against

7

MyWebGrocer's initial counterclaims. The court deferred determination of the actual amount of attorney's fees that could be collected until after an appeal to this Court.

¶ 16. Both parties now appeal. MyWebGrocer appeals the court's decision finding in Tanzer's favor on the contract claim, as well as the jury decision finding for Tanzer on the covenant of good faith and fair dealing claim, the jury's awards of compensatory and punitive damages, and the court's post-trial decision permitting Tanzer to recover attorney's fees. Tanzer appeals the trial court's decision on summary judgment in MyWebGrocer's favor on his claim that MyWebGrocer violated Vermont's wage and compensation law by withholding the amount Tanzer was due under the phantom share plan. Tanzer also appeals the court's post-trial decision permitting him to recover attorney's fees for some, but not all, of MyWebGrocer's litigation conduct. We address each of these issues in turn.

## II. The Breach of Contract Claim

¶ 17. This Court reviews summary judgment decisions de novo, and applies the same standard as the trial court. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). The question presented here relates solely to the meaning of MyWebGrocer's phantom share plan, and whether the plan promised members ten percent of the equity of the company at the time that phantom shares were paid out, regardless of the company's organization as an LLC or a corporation. We interpret contract provisions "to give effect to the intent of the parties as that intent is expressed in their writing." Hamelin v. Simpson Paper Co., 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). "When the contract language is clear, the intent of the parties is taken to be what the agreement declares." Id. We conclude that there is no genuine dispute in this case: each pre-2009 version of MyWebGrocer's phantom share plan expressly contemplates the plan's amendment upon MyWebGrocer's reorganization into a corporation in a manner other than by holding an IPO; the pre-2009 plans' share valuation formula became essentially meaningless upon

8

the company's reorganization as a corporation; and the 2009 plan amendment, undertaken when the company reorganized into a corporation, is consistent with the pre-2009 plans' conversion of phantom shares in the event of an IPO. Accordingly, we reverse the trial court's decision on this issue.

¶ 18. The trial court's decision began with consideration of which iteration of the phantom share plan applied to Tanzer, and concluded that the February 2008 plan MyWebGrocer gave Tanzer after his termination controlled. Tanzer argues on appeal that the court correctly concluded this was the applicable plan. MyWebGrocer, by contrast, argues that the result in this case is the same regardless of which plan applied. We agree with MyWebGrocer—whether the February 2008 plan was controlling at the time of Tanzer's termination does not control the eventual valuation of Tanzer's, or other employees', phantom shares in the company. Thus, we will assume, without deciding, that the February 2008 phantom share plan was effective at the time of Tanzer's termination. But as we explain more fully below, this does not translate into a valuation of Tanzer's phantom shares according to a formula in the 2008 plan or as a percentage valuation based on his proportional interest in ten percent of the value of MyWebGrocer as a whole at the time shares were paid out.

¶ 19. Four provisions of the February 2008 plan are relevant here:

> 4.2 <u>Number of Shares Awarded.</u> The maximum number of Phantom Shares that may be awarded under this Plan shall be determined by the Committee, provided, however, that the maximum number of Phantom Shares to be awarded under this Plan shall represent a ten percent (10%) Distributional Interest in the Company.
>
> . . .
>
> 5.2 <u>Change in Control of the Company.</u> In the event of a Change in Control of the Company, each Phantom Share credited to the Phantom Share Account of a Participant shall immediately prior thereto or coincident therewith be converted into a Distributional Interest in the Company pursuant to the following formula:
>
> $$X \div N * 10\% = \text{Membership Interest}$$

Where X = The number of outstanding Phantom Shares credited to the Participant's Phantom Share Account as of the date of such sale and N equals the maximum number of Phantom Shares that may be awarded under this Plan.

For purposes of illustration, on the date of a Change in Control a Participant has received Awards of 20,000 Phantom Shares and the maximum number of Phantom Shares in the Plan is 2,500,000, the Participant's Phantom Shares would be converted into a .08% Distributional Interest (20,000 ÷ 2,500,000 * 10% = 0.08%).

5.3 <u>Initial Public Offering.</u> In the event that the Company will be reorganized as a corporation for the purpose of becoming publicly traded on an established securities exchange, each Phantom Share credited to the Participant's Phantom Share Account shall immediately prior thereto or coincident therewith be converted into a Distributional Interest in the Company pursuant to the formula specified in Section 5.2. The Participant's Distributional Interest shall then be converted into a sufficient number of shares of the common stock of the Company that will provide each Participant with the same ownership interest in, and rights to share in the profits of and distributions from the Company as would have been attributable to such Participant's Distributional Interest.

For purposes of illustration, on the date of the initial public offering a Participant had received Awards of 20,000 Phantom Shares, and the maximum number of Phantom Shares in the Plan is 2,500,000, the Phantom Shares would be converted into a .08% Distributional Interest (20,000 ÷ 2,500,000 [*] 10% = .08%). If there were 25,000,000 shares of common stock of the Company outstanding on the date of the conversion of the Company from a limited liability company to a corporation, the Participant would, thus, receive 20,000 shares of common stock of the Company.

. . .

5.5 <u>Conversion of the Company to a Corporation.</u> This Plan shall be amended by the Committee if the Company, other than as contemplated in Section 5.3, converts from a limited liability company to a corporation so that the conversion of Phantom Shares shall be to common stock of the Company and not Distributional Interests.

These four provisions lay out the essential mechanics of the 2008 phantom share plan. First, under Section 5.2, vested phantom shares shall be paid out upon a change in control of the company, an event separately defined in the plan as either "a change in the ownership of the Company" or "a

change in the ownership of a substantial portion of the Company's assets." Under Section 4.2, the total number of phantom shares awarded to the group of share recipients is left to the discretion of the plan's administering committee, but the value of that total number equals ten percent of the distributional interest in MyWebGrocer. The value of each individual phantom share under this plan is calculated according to Section 5.2's formula, which, as with the bulk ten-percent interest of the phantom shareholders as a group, is given in terms of distributional interest. As noted above, MyWebGrocer was organized as an LLC during the course of Tanzer's employment. Thus, had a change in control occurred during Tanzer's employment, the formula in Section 5.2 of the February 2008 plan would have had meaning, as it translated vested phantom shares into a proportional distributional interest in ten percent of the company's total distributional interest.

¶ 20.    Sections 5.3 and 5.5, on the other hand, provide for the possibility that MyWebGrocer could reorganize as a corporation. Section 5.3 addresses the specific conversion of phantom shares into common stock in the event of an IPO. The timing of Section 5.3's conversion is significant for the analysis here. Before the company converts from an LLC to a corporation, or at the time of conversion, each phantom share is converted into a distributional interest according to Section 5.2's formula. Thus, the ten-percent total distributional value of all phantom shareholders is calculated before or at the time of conversion to a corporation, as is the proportional interest in that ten percent accorded to each individual phantom shareholder. After this initial conversion, each shareholder's proportional share of the distributional interest is converted into an equivalent proportional interest in the total equity, or stock, of the newly formed corporation. In this way, each phantom shareholder has, at the time of incorporation, the same interest in the company as the shareholder had before incorporation, and the ten-percent bulk interest of the phantom shareholders as a group promised in Section 5.2 is maintained at the time of incorporation. After this conversion, the IPO is held, and newly issued shares in the company are offered on a securities exchange. The equity interest held

11

by participants in the phantom share plan at the time of incorporation is thus diluted immediately after conversion and valuation of the phantom shares.

¶ 21.   Under Section 5.3 a phantom shareholder's individual interest in the company is converted into common stock. That is, the phantom shareholder does not simply receive a payout for the value of the interest held in the company, as is the case for a distributional interest payout under Section 5.2. Rather, the shareholder's phantom shares are converted into an equity interest in the company based on ownership of actual shares of stock. Section 5.3 thus necessarily requires a fixed calculation of the total number of shares of stock that exist in the company. Without a fixed number, the ten-percent interest of the phantom shareholders could not be calculated such that ownership of actual shares could be transferred to individual phantom shareholders.

¶ 22.   Finally, Section 5.5 expressly states that the phantom share plan's calculation formula will be amended if the company incorporates other than through an IPO. A provision permitting such an amendment allows the plan to accommodate the different financial and equity interests in an LLC and a corporation. On one hand, an LLC calculates its members' stake in the entity in terms of a distributional interest. "Distributional interest" is a term of art that describes the financial value of an interest in an LLC. 11 V.S.A. § 4001(8) (" 'Distribution' means a transfer of money or property from a limited liability company to a member in the member's capacity as a member or to a transferee of the member's distributional interest."); id. § 4001(9) (" 'Distributional interest' means the right of a member or transferee to receive a distribution from a limited liability company."). On the other hand, a corporation's financial and equity interests are founded on stock ownership. A formula, such as that in Section 5.2 of the February 2008 plan, converting phantom shares into a distributional interest in MyWebGrocer as an LLC would be essentially meaningless for purposes of computing the stock-based valuation of those same phantom shares within a corporate structure. Section 5.5 gets around this problem by permitting amendment of the plan to account for a shift in the company's organization.

¶ 23.    As contemplated by Section 5.5, MyWebGrocer amended the phantom share plan in 2009 when the company incorporated.  The company did not hold an IPO, nor did a change in control of the company occur at this time.  Thus, neither Section 5.2 nor Section 5.3 came into play— phantom shares were not actually converted to common stock as they would have been following an IPO, and shareholders were not paid out as they would have been in the event of a change in control.

¶ 24.    Three provisions of the 2009 amended phantom share plan are relevant here:

> Section 4.2  Number of Shares Awarded.  The number of Phantom Shares that have been awarded under this Plan is 2,544,160.  No further awards of Phantom Share[s] shall be made.
>
> . . .
>
> Section 5.2  Change in Control of the Company.  In the event of a Change in Control of the Company, each vested Phantom Share credited to the Phantom Share Account of a Participant shall be converted into one-tenth (1/10th) of one Share.
>
> Section 5.3  Initial Public Offering.  In the event that the Company becomes publicly traded on an established securities exchange (an "Initial Public Offering"), each vested Phantom Share credited to the Participant's Phantom Share Account shall be converted into one-tenth (1/10th) of one Share.

Section 4.2 of the 2009 amended phantom share plan capped the total number of phantom shares at the number of vested shares granted to phantom shareholders at that time.  Section 5.2 provided a conversion formula by which phantom shares would be converted to actual shares of MyWebGrocer upon a change in control of the company.  Applying this formula, 254,416 total shares of MyWebGrocer were essentially held in reserve for dispensation to phantom shareholders upon a change in control of the company.  Other shareholders held 2,250,001 shares in the company, which, unlike the phantom shares at the time of incorporation, represented an actual equity interest in the company.  Thus, at the time of incorporation, just over ten percent of the company's equity was effectively held in reserve for the phantom shareholders.  Section 5.2's conversion formula likewise applies under Section 5.3, and thus the phantom shares held in reserve post-incorporation would be

13

converted into actual shares under the same formula if MyWebGrocer held an IPO. As mentioned above, upon incorporating, and after the 2009 plan fixed the total number of phantom shares, and by extension, the total number of shares of stock in the company, MyWebGrocer issued 785,462 new shares of preferred stock to an investor, thereby diluting the equity interests of all previous shareholders, including the phantom shareholders.

¶ 25. Tanzer argues that each iteration of MyWebGrocer's phantom share plan provided that, upon a change in control of the company, phantom shares would be converted "to a fixed percent of the equity of the company." This argument reads Sections 4.2, 5.2, and 5.3 of the February 2008 plan to control the percentage of equity interest granted to phantom shareholders regardless of whether the company remained an LLC or converted to a corporation, and, therefore, essentially reads out Section 5.5's provision permitting amendment of the plan upon incorporation. We disagree with Tanzer's interpretation for the following reasons.

¶ 26. First, although the February 2008 plan grants phantom shareholders ten percent of the company's distributional interest, this is not plainly equivalent to ten percent of the company's equity, or stock, if the company is reorganized as a corporation. "Distributional interest" is a term of art used to describe the monetary payments made to a member in an LLC. 11 V.S.A. § 4001(9). Had the parties intended for § 5.2 to govern the phantom share payout in the event of a change of control in the company if it later converted to a corporation, they would have used a term consistent with that intention, such as "equity" or "stock."

¶ 27. Second, the 2008 plan, and each preceding iteration of the plan, permitted amendment of the plan in the event that MyWebGrocer reorganized as a corporation other than through an IPO. Even assuming that this provision related solely to the plan's formula for valuation of phantom shares, the 2009 amendment altered the phantom shares calculation to maintain the ten-percent equity of phantom shareholders upon corporate organization. This is consistent with Section 5.3 of the 2008 plan and that Section's formula for conversion of phantom shares to stock in the event of

14

an IPO. The phantom shares conversion set out in Section 5.3 of the February 2008 plan preserves ten percent of the interest in the company at the instant of conversion for phantom shareholders, but this ten percent is more or less immediately diluted. Section 5.3 plainly contemplates a timeline wherein phantom shares convert to common stock such that phantom shareholders keep the same proportional interest in ten percent of the corporation's stock that they would have had in the LLC's distributional interest, and that conversion is immediately followed by an IPO in which new shares are issued for sale on a securities exchange. Thus, even though phantom shareholders would hold ten percent of the equity in the company at the instant of incorporation, that percentage would be immediately diluted as a result of the issuance of preferred stock. This is essentially what happened here. MyWebGrocer amended the phantom share plan to set aside ten percent of the stock issued upon incorporation for Tanzer and other phantom shareholders, and MyWebGrocer then issued new shares in the company just as it would have done in an IPO.

¶ 28. Common law offers no protection against the dilution of equity interests, so anti-dilution protection must be provided by contract. M. Kahan, Anti-Dilution Provisions in Convertible Securities, 2 Stan. J. L. Bus. & Fin. 147, 148 (1995). The trial court read Section 4.2 of the 2008 plan as, essentially, an anti-dilution provision, a conclusion that Tanzer reiterates on appeal. But this conclusion relies on a construction that equates a ten-percent distributional interest with ten percent of the stock issued by a corporation, ignoring the plain meaning of both Sections 4.2 and 5.3 in the 2008 plan. Therefore Section 4.2 cannot be read as an anti-dilution provision and, absent any other anti-dilution provision in the phantom share plan, the common law rule permitting dilution controls. "Contracts . . . are enacted against a background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the parties' intent that they not govern." Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Wells, 213 F.3d 398, 402 (7th Cir. 2000). Here, the parties' intent regarding treatment of the phantom shares upon incorporation associated

15

with an IPO is set forth in Section 5.3 of the 2008 plan. That Section does not provide for payout of the phantom shares, but rather their conversion into actual shares of stock in the newly formed corporation—shares that are subject to immediate dilution pursuant to the IPO. Therefore, Section 4.2's payout provision cannot be read to guarantee a fixed ten-percent interest in MyWebGrocer despite the company's reorganization.

¶ 29. Given that the dilution that actually occurred here is consistent with the dilution contemplated in Section 5.3 of the 2008 plan, we cannot say that the 2009 plan reduced the interests of phantom shareholders impermissibly. Accordingly, we cannot conclude that MyWebGrocer breached the phantom share agreement with Tanzer by offering to pay him the value of his phantom shares as calculated under Section 5.2 of the 2009 plan. We therefore reverse the trial court's decision granting Tanzer summary judgment on his breach of contract claim against MyWebGrocer.

¶ 30. The court concluded that the resolution at summary judgment in favor of Tanzer on his contract claim rendered Tanzer's alternate claims for unjust enrichment and promissory estoppel moot. Neither party had moved for summary judgment on those two claims, and neither party has appealed that specific decision. Nonetheless, because we reverse the trial court's decision on the contract claim, we necessarily also reverse the trial court's decision on the unjust enrichment and promissory estoppel claims.

### III. The Breach of the Covenant of Good Faith and Fair Dealing Claim

¶ 31. Our decision on Tanzer's breach of contract claim controls the outcome of several of the remaining issues on appeal, beginning with the jury verdict on Tanzer's claim that MyWebGrocer breached the covenant of good faith and fair dealing and the jury's awards to Tanzer related to that claim. We conclude that allowing the jury to consider the court's decision on summary judgment clouded the evidence presented to the jury regarding Tanzer's breach of covenant claim and therefore vacate the jury's verdict on this claim.

¶ 32. The covenant of good faith and fair dealing is implied in every contract. Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993). Thus, "[a] cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties, but breach of that underlying contract is not necessary before bringing a tort action under the covenant." Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 54, n.5, 179 Vt. 167, 893 A.2d 298 (citation omitted). We have explained that the covenant acts to protect the parties to a contract, and to ensure that they "act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Carmichael, 161 Vt. at 208, 635 A.2d at 1216 (quotation omitted). The covenant's protection does not extend simply to actions taken in fulfillment of a contract, but also actions taken in terminating a contract and winding up the contractual relationship between the parties. Id. at 210, 635 A.2d at 1217. The covenant likewise "covers not only contract performance, but also contract enforcement," including "settlement and litigation of contract claims and defenses." Langlois v. Town of Proctor, 2014 VT 130, ¶ 61, 198 Vt. 137, 113 A.3d 44 (quotation omitted). The covenant of good faith and fair dealing "is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts." Id.

¶ 33. A breach of the covenant may be shown by evidence that a party to a contract acted in such a way as to "violate[] community standards of decency, fairness or reasonableness, demonstrate[] an undue lack of diligence, or [take] advantage of [other parties'] necessitous circumstances." Monahan, 2005 VT 110, ¶ 3. A party may collect punitive damages under the covenant where the party can show that the other party acted with actual malice. Id. ¶ 54 n.5. "Actual malice may be shown by conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." Id. ¶ 4. Where a party alleges both breach of contract and breach of the implied covenant of good faith and fair dealing, dual causes of action are permitted only where the different actions are premised on different

17

conduct—"we will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract based upon the same conduct." Id. ¶ 54, n.5 (emphasis in original); see Ferrisburgh Realty Inv'rs v. Schumacher, 2010 VT 6, ¶ 26, 187 Vt. 309, 992 A.2d 1042.

¶ 34. As we have explained, whether conduct breaches the covenant is a question of fact that depends heavily on the context of the conduct alleged to have breached the covenant. Carmichael, 161 Vt. at 209, 635 A.2d at 1217. So a jury instruction concerning a breach of the covenant will list few "precise analytical elements," but will instead ask the jury to determine whether, given the surrounding context of the alleged conduct, that conduct constitutes a breach. Id.

¶ 35. The problem in this case arises from the context-dependent nature of an action for breach of the covenant. Although the court's written decision on summary judgment was not admitted into evidence, the court did instruct the jury that the court had previously decided a breach of contract claim in Tanzer's favor. The court also permitted witness testimony regarding MyWebGrocer's phantom share plans, dilution of the phantom shareholders' stake in the company, and the different amounts payable to Tanzer under the parties' warring interpretations of the phantom share plan and the court's decision in Tanzer's favor on the plan interpretation.

¶ 36. For example, during MyWebGrocer's cross examination of Tanzer, the following exchange regarding MyWebGrocer's pretrial attempt to settle the dispute with Tanzer occurred:

> Attorney: And MyWebGrocer has tried to resolve this case with you, has it not?
>
> Tanzer: I would strongly disagree with that.
>
> Attorney: Would you agree with me that in March of 2014, that MyWebGrocer made an offer to you—
>
> Tanzer: Um-hum.
>
> Attorney: —through your attorney—
>
> Tanzer: Um-hum.

18

Attorney: —to pay you the—to keep the amount you already had—no question about that—to pay you another fifty thousand dollars and to pay you your attorneys' fees, to date?

Tanzer: That was two hundred thousand dollars below the amount that was clearly delineated, in the phantom share plan, owed to me. I didn't consider that to be a valid offer.

Attorney: Okay. That was before there was a decision as to whether or not that phantom share plan should be read the way that you believe it should be read?

Tanzer: Well, so here we have a problem.

Attorney: Excuse me. My question is—

Tanzer: Um-hum.

Attorney: —you interpreted the plan that way and eventually, the court did agree with you?

Tanzer: Absolutely, it did.

Attorney: That's no question, okay.

MyWebGrocer's settlement attempt followed the company's intial offer to pay Tanzer in accordance with the amount due under Section 5.2 of the 2009 phantom share plan, which we have decided here was the correct amount due under the parties' agreement. Tanzer's claim for breach of the covenant was premised in part on his argument that MyWebGrocer unreasonably delayed litigation between the parties. And in response to that argument, MyWebGrocer attempted to elicit testimony that it had tried to settle the parties' dispute pretrial, but in eliciting that testimony, Tanzer also testified as to the court's decision finding that his interpretation of the phantom share plan was correct and the substantial sum of money at issue under the different plan interpretations. In this way, the summary judgment decision on the breach of contract claim clouded the issues in the breach of covenant claim.

¶ 37. The parties' alternate interpretations of the phantom share plan came up again during Tanzer's cross examination of Jeremiah Tarrant, one of the named defendants and a MyWebGrocer corporate officer. Here, Tanzer's attorney states the amount that Tanzer would have been due under

19

the 2008 plan if that plan's ten-percent distributional interest payable to phantom shareholders upon a change in control of the company was equivalent to a ten-percent equity interest post-incorporation and controlled the amount due to Tanzer. The exchange is as follows:

> Attorney: Because if you had paid him under the 2008 plan, you would have paid him the 734,000 plus the 69,000 that [Tanzer's attorney] asked for, wouldn't you?
>
> Tarrant: No. That's not accurate.
>
> Attorney: What's inaccurate about that?
>
> Tarrant: Your statement was—he got treated the same as everybody, ourselves included. Everybody was handled identically.
>
> Attorney: So you mean you cheated everybody else as well? You short changed them?
>
> Tarrant: No, I wouldn't cheat anybody.
>
> Attorney: Okay. Thanks, that's all I have.

This exchange seems to invite the jury to conclude that MyWebGrocer breached the covenant of good faith and fair dealing based on MyWebGrocer's failure to pay Tanzer the amount the court incorrectly concluded he was due under the 2008 phantom shares plan. Again, in this way, the court's summary judgment decision on Tanzer's breach of contract claim was interwoven with the remainder of the evidence before the jury and likely affected the jury's verdict on Tanzer's claim for breach of the covenant of good faith and fair dealing.

¶ 38. The court's instructions to the jury included a limiting instruction—that although the court's prior ruling regarding interpretation of the phantom share plan should be assumed correct, "that ruling [had] nothing whatsoever to do with . . . the entirely separate claim of whether the defendant, MyWebGrocer, breached the implied covenant of good faith and fair dealing." The court also correctly instructed the jury regarding the implied covenant of good faith and fair dealing— "that MyWebGrocer made an implied promise not to do anything to destroy or impede Mr. Tanzer's ability to get the benefits of his agreement with MyWebGrocer under the phantom share plan" and

20

that "bad faith implies an intention to mislead or deceive another, or a neglect or refusal to fulfill some duty or other contractual obligation not prompted by an honest mistake or disagreement." But the jury was also asked to draw inferences within the context of the entire field of evidence presented, including testimony such as that included above regarding the parties' different interpretations of the phantom shares plan. The court's summary judgment decision on the breach of contract claim thus colored the background of the breach of the covenant claim and filled in at least part of the context within which the jury made its decision. Because the summary judgment decision was incorrect, and the context of the covenant claim was accordingly incorrect, the jury's verdict cannot stand.

¶ 39. This is not to say that Tanzer may not be able to pursue a claim for breach of the covenant of good faith and fair dealing. Tanzer presented evidence beyond that relating to the breach of the contract between the parties, and the conduct alleged to underpin Tanzer's contract and covenant claims does not completely overlap.

¶ 40. As noted above, the covenant covers not just contract fulfillment, but also contract enforcement, including settlement and litigation. Langlois, 2014 VT 130, ¶ 61. Even so, there is a distinction between litigation conduct that violates the covenant and litigation conduct that is an aggressive prosecution or defense. Litigation conduct that reflects dishonesty—"such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts"—violates the covenant of good faith and fair dealing. Id. Litigation conduct falling below this high bar does not. Because we are remanding Tanzer's covenant claim, we need not consider the trial court's decisions in the first trial regarding whether particular acts alleged by Tanzer as violating the covenant fell within the umbrella of litigation conduct suggesting dishonesty. Nevertheless, we emphasize that any litigation conduct alleged to have breached the covenant must fall within the narrow scope of dishonest conduct.

21

¶ 41. We likewise need not consider MyWebGrocer's arguments related to the jury's damages awards or the parties' arguments related to whether Tanzer could recover attorney's fees. Any damages awards that may follow a new trial on the covenant claim will need to be considered in light of the evidence presented in a new trial. It nonetheless bears repeating that a party may only pursue punitive damages on a breach of the covenant claim when the party has presented evidence that the other party acted with actual malice—as "shown by conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." Monahan, 2005 VT 110, ¶ 4 (quotation omitted). Any request for attorney's fees will also need to be considered in light of the evidence presented in a new trial. Though here again, we emphasize that attorney's fees are only recoverable upon a showing of bad faith litigation conduct. See id. ¶¶ 76-80. As we explained in In re Gadhue, "where the wrongful act of one person has involved another in litigation . . . or has made it necessary for that other person to incur expenses to protect his interests, litigation expenses, including attorney's fees, are recoverable." 149 Vt. 322, 327, 544 A.2d 1151, 1154 (1987) (quotation omitted).[2]

## IV. The Statutory Claim

¶ 42. This brings us to the final issue on appeal. Tanzer argues that MyWebGrocer violated Vermont statutes governing the payment of wages, 21 V.S.A. §§ 341-348, when the company did

---

[2] Because we are vacating the jury's verdict, we also need not consider MyWebGrocer's argument that Tanzer's trial counsel impermissibly inserted her own testimony into the record during her cross examination of a MyWebGrocer witness leading to prejudice to MyWebGrocer's defense. Professional Rule of Conduct 3.7 recognizes the possible prejudice inherent in permitting an attorney to give testimony in a proceeding in which the attorney represents a client. As the comment to the Rule states: "Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses." Comment, V.R.Pr.C. 3.7. In this case, MyWebGrocer argues that Tanzer's attorney effectively testified regarding settlement negotiations between the parties through the questions she asked MyWebGrocer's witness during cross examination. We need not fully address this here, but we do note that Rule 3.7 counsels strongly against permitting an attorney to ask a witness questions that introduce the attorney's personal knowledge of the subject of the witness's testimony.

not pay him the amount Tanzer claimed was due under the phantom share agreement. The trial court granted summary judgment to MyWebGrocer on this claim, concluding that the payment due under the phantom share agreement was uncertain—"more like a lottery ticket than a debt"—and thus did not fall within the definition of wages. We disagree, and therefore reverse.

¶ 43. Wages are defined as "all remuneration payable for services rendered by an employee, including salary, commissions, and incentive pay." Id. § 341(5). We have not previously considered whether payout of phantom shares according to the kind of agreement in play here falls within the scope of wages for purposes of this statutory scheme. We have held that the purpose of Vermont's wage statutes "is to ensure that workers are paid in a timely manner." Stowell v. Action Moving & Storage, Inc., 2007 VT 46, ¶ 8, 182 Vt. 98, 933 A.2d 1128. We have also explained that the wage statutes, "[a]s remedial statutes, . . . must be liberally construed." Id. The question presented here is one of statutory interpretation, and our review of statutory language is de novo. State v. Love, 2017 VT 75, ¶ 9, __ Vt. __, 174 A.3d 761. When we construe a statute, we begin with the plain language of the statute. Id. If the plain language does not speak to the question presented, we look to the legislative purpose behind the statute. Id.

¶ 44. The statutory definition of wages is broad, though it is not without parameters. In other contexts, we have defined wages as earnings. Perrault v. Chittenden Cty. Transp. Auth., 2018 VT 58, ¶ 18, __ Vt. __, 192 A.3d 381; Quinn v. Pate, 124 Vt. 121, 124, 197 A.2d 795, 797 (1964). The definition of earnings is likewise broad—"earnings are something earned as compensation for labor or the use of capital, a broader definition than the conventional definition of wages, which are ordinarily defined as amounts of money paid daily or weekly for labor." Perrault, 2018 VT 58, ¶ 18 (quotations omitted). We relied on this definition of wages in Stowell, and it guides our analysis in this case. 2007 VT 46, ¶ 10. The precise question before us, then, is whether payout of Tanzer's phantom share award qualifies as compensation earned through Tanzer's service to MyWebGrocer.

23

¶ 45.    Other states that have considered similar questions have identified two factors as relevant to this question: (1) whether the compensation at issue is awarded because of the employee's service, or because of the growth and financial success of the employer, and (2) whether the employer has discretion regarding whether to award the compensation.  See, e.g., Weems v. Citigroup, Inc., 961 A.2d 349, 357 (Conn. 2008); Truelove v. Ne. Capital & Advisory, Inc., 738 N.E.2d 770, 771-72 (N.Y. 2000); Coen v. SemGroup Energy Partners G.P., LLC, 2013 OK CIV APP 75, ¶ 21, 310 P.3d 657.  For example, in Truelove, a New York court held that an employee's bonus, which "if paid, w[ould] reflect a combination of the individual's performance and Northeast Capital's performance," did not fall within a statutory definition of wages, which was similar to Vermont's.  738 N.E.2d at 771-72 (alteration in original) (quotation omitted).  The court explained that the bonus was "in the nature of a profit-sharing arrangement and [was] both contingent and dependent, at least in part, on the financial success of the business enterprise."  Id. at 772.  The amount of the bonus was not fixed, but rather depended on the financial success of the company. Just as importantly, the terms of the bonus distribution in the employee's compensation agreement stated that bonuses would be paid at the employer's discretion and the employee forfeited the right to any distributed bonus upon ceasing employment with the company.  Id. at 771-72.  The Truelove claimant had resigned before payment of the bonus, and thus, though the bonus was scheduled to be paid, the company had discretion to cancel payment.  The bonus did not fall within the statutory definition of wages because payment of the bonus was tied to the company's financial success as much as the employee's contributions to the company, and payment of the bonus was in the sole discretion of the employer.

¶ 46.    The Connecticut Supreme Court followed Truelove's reasoning in Weems to conclude, similarly, that employee bonuses did not fall within the statutory definition of wages. 961 A.2d at 356.  In that case, the corporate defendant paid portions of employee bonuses in restricted stock in the company.  And as in Truelove, the relevant compensation agreement between employees

24

and the company provided that bonuses were awarded at the discretion of the company and employees forfeited bonuses upon ceasing employment with the company. Id. at 353. The Connecticut court adopted Truelove's statement that the relevant wage statutes, " 'in expressly linking earnings to an employee's labor or services personally rendered, contemplate[d] a more direct relationship between an employee's own performance and the compensation to which that employee is entitled.' " Id. at 356 (quoting Truelove, 738 N.E.2d at 770). On the other hand, "bonuses that are awarded solely on a discretionary basis, . . . not linked solely to the ascertainable efforts of the particular employee, are not wages." Id. at 357.

¶ 47. An Oklahoma court employed similar reasoning in Coen in deciding whether phantom units, paid out upon a change in control of the company, qualified as wages under an Oklahoma law analogous to Vermont's wage statutes. The court held that they did not for three primary reasons. 2013 OK CIV APP 75, ¶ 23. First, the plan under which the phantom units were issued was an incentive compensation plan that the court concluded was meant to increase the performance of both the company and individual employees, thus the award of phantom units did not depend solely on the employee's performance. Id. ¶ 22. And to the extent that an award under the plan was based on the employee's performance, any award was linked to the employee's future performance, not to services the employee had already rendered to the company. Id. Second, the plan under which units were issued reserved discretion in plan administrators regarding whether to award phantom units until the units had vested. Id. And finally, phantom units, like the phantom shares in this case, were payable only upon a change in control of the company. Id. ¶ 23. In other words, whether the phantom units were payable at all depended entirely on factors outside of an individual employee's control.

¶ 48. With a single caveat, we find the reasoning of these courts persuasive. Vermont's wage statutes are directed at "ensur[ing] that workers are paid in a timely manner." Stowell, 2007 VT 46, ¶ 8. Thus, the statutes govern an employer's duty to pay an employee wages that are actually

25

due; the way in which wages may become due is beside the point. That is, if a payment falls within the definition of wages for purposes of the wage statutes, the triggering event that renders that payment due is irrelevant. We accordingly find the Oklahoma court's final argument unpersuasive. And thus, in this case, the fact that the phantom share plan predicated any payment on a change in control of MyWebGrocer is not relevant to consideration of whether, once the phantom shares were actually payable, the amount due under the phantom share plan met the definition of wages.

¶ 49.   That said, the core reasoning of Truelove, Weems, and Coen is otherwise in agreement with our definition of wages as earnings and the remedial purpose of Vermont's wage statutes. And here, we conclude that the phantom share payout satisfies the necessary criteria for wages.

¶ 50.   It is undisputed that Tanzer received phantom shares as part of his compensation package. Shares vested at a set rate during Tanzer's employment, they were given in bulk installments, and, for a period of time during Tanzer's employment, he received phantom shares in exchange for a reduced salary. Like the bonus plans at issue in Truelove and Weems, the actual monetary value of the phantom shares was tied to MyWebGrocer's financial success, but unlike the bonus plans at issue in those cases, Tanzer's receipt of the phantom shares upon a change in control of MyWebGrocer was tied neither to Tanzer's service to the company nor to MyWebGrocer's financial success. That is, payout of the phantom shares did not directly depend on MyWebGrocer's growth, but rather on the occurrence of a specified triggering event. Although the occurrence of that triggering event, a change in control of the company, did in this case flow from the financial success of the company, the plan itself did not predicate a change in control upon growth of the company. Thus, we cannot say that payout of the phantom shares was linked solely to the success of MyWebGrocer, and characterizing the phantom shares as incentive pay would accordingly go too far. Rather, payout under the phantom share plan was guaranteed simply on a change in control, regardless of the causes of that change in control. And once a change in control occurred,

26

MyWebGrocer had no discretion under the phantom share plan to decline to pay Tanzer or other phantom shareholders the value of their phantom shares. For these reasons, we conclude that the value of Tanzer's phantom shares meets the definition of wages for purposes of Vermont's wage statutes. We accordingly reverse the trial court's decision on summary judgment and remand for further proceedings consistent with this opinion.

The trial court's summary judgment decision on the breach of contract claim is reversed. The trial court's summary judgment decisions on the unjust enrichment, promissory estoppel, and wage statute claims are reversed and remanded for proceedings consistent with this opinion. The jury's verdict on the breach of the covenant of good faith and fair dealing claim is vacated.

FOR THE COURT:

_____

Associate Justice

27